UNITED STATES DISTRICT COURT                    b
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| FRANCES BREAUX | CIVIL ACTION 2:16-CV-00702 |
| VERSUS | JUDGE TRIMBLE |
| CAROLYN W. COLVIN,[1] COMMISSIONER | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION

### I.  Background

#### A.  Procedural Background.

Frances Breaux ("Breaux") filed applications for Social Security Income Benefits ("SSI") (Doc. 9-1, p. 238/692) and Disability Insurance benefits ("DIB") on November 18, 2013 (Doc. 9-1, p. 231/692), alleging a disability onset date of June 1, 2008 due to back problems, neck problems, hand problems, neuropathy, severe pain, and learning disability (Doc. 9-1, pp. 149, 231, 238/692).   Those applications were denied by the Social Security Administration ("SSA") (Doc. 9-1, pp. 162, 166/692).

A *de novo* hearing was held before an administrative law judge ("ALJ") at which Breaux appeared with her attorney (Doc. 9-1, p. 66/692).  The ALJ found that Breaux has severe impairments of degenerative changes of the cervical and lumbar spine, neuropathy, obesity, and carpal tunnel syndrome (Doc. 9-1, p. 49/692).  The ALJ concluded that Breaux can do light work except she is limited to unskilled work

---

[1] Carolyn Colvin was replaced by Acting Commissioner of Social Security Nancy A. Berryhill on January 23, 2017.

that requires no more than frequent climbing of ramps and stairs and occasional climbing of ropes, ladders, or scaffolds (Doc. 9-1, p. 52/692).  The ALJ found Breaux can do work that exists in significant numbers as indicated by Medical-Vocational Guideline Rule 202.17 (Doc. 9-1, p. 58/692).  The ALJ concluded that Breaux was not disabled at any time through the date of his decision on May 1, 2015 (Doc. 9-1, p. 59/692).

Breaux requested review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 9-1, p. 5/692), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Breaux next filed this appeal for judicial review of the Commissioner's final decision.  Breaux raises the following issues for review (Doc. 10):

1.  The ALJ failed to properly assess Breaux's mental impairments.

2.  The residual functional capacity determination is not supported by substantial evidence.

3.  The ALJ's use of the Medical-Vocational Guidelines is inappropriate in light of Breaux's mental impairments and limitations.

4.  The Appeals Council erred as a matter of law in failing to consider new and material evidence.

The Commissioner filed a brief in response (Doc. 11).  Breaux's appeal is now before the Court for disposition.

### B.    Medical Records.

In May and June 2007, Dr. Christopher Y. Lew, a pain management doctor, gave Breaux right lumbar and sacral myoneural injections for relief of pain from chronic lumbosacral strain (Doc. 9-1, p. 341, 343/692).  Breaux was also having

anxiety attacks (Doc. 9-1, p. 341/692).  In July 2007, Dr. Lew noted that Breaux had severe persistent pain and spasms from lumbar radiculopathy (Doc. 9-1, p. 339/692). From July 2007 through January 2008, Dr. Lew continued to treat Breaux's lumbar radiculopathy and chronic lumbar strain with right lumbar and sacral myonerual injections (Doc. 9-1, pp. 323, 327, 329, 331, 333, 335, 339/692).  Dr. Lew noted Breaux had obtained some pain relief from nerve blocks administered bilaterally at L5 and S2 in July 2007 (Doc. 9-1, p. 327, 333, 335, 337/692).  However, Breaux was involved in a motor vehicle accident the day after the nerve blocks, which strained her neck and caused tenderness in the upper back and neck (Doc. 9-1, p. 335/692).

Breaux was also evaluated at Moss Regional Medical Center.  In August 2008 and June 2009, Breaux's cholesterol was high (Doc. 9-1, p. 372, 382/692).  In August 2008, Breaux was 5'3" tall, weighed 292 pounds, complained of abdominal pain, and was diagnosed with headaches and obesity (Doc. 9-1, p. 368-69/692).  CT scans of her abdomen, pelvis, and head were normal (Doc. 9-1, pp. 390-92/692).

In December 2008, Breaux (28 years old) complained of ear pain and stomach problems (Doc. 9-1, p. 365/692).  Breaux's cholesterol was higher, she weighed 302 pounds, and it was noted she had skipped two appointments with the dietician (Doc. 9-1, p. 365/692).  Breaux was prescribed Nexium Crestor, Cymbalta, and Cipro, and was again referred to the dietician (Doc. 9-1, p. 365/692).

In January 2009, Breaux's blood pressure was 118/64 (Doc. 9-1, p. 363/692).  In March 2009, Breaux weighed 312 pounds and her blood pressure was 113/70 (Doc. 99-1, p. 362/692).  Breaux had a negative upper GI series of x-rays (Doc. 9-1, p.

387/692) and a negative pelvic ultrasound (Doc. 9-1, p. 388-89/692).  In March 2009 and June 2009, her glucose was high (Doc. 9-1, p. 372, 375/692).

In September 2009, Breaux weighed 323 pounds and her blood pressure was 132/73 (Doc. 9-1, p. 360/692).  Breaux complained of dizziness and earaches (Doc. 9-1, p. 360/692).

In January 2010, Breaux weighed 334.5 pounds and her blood pressure was 136/67 (Doc. 9-1, p 359/692).  Chest x-rays of her heart and lungs were normal (Doc. 9-1, p. 384/692).  An x-ray of her left lower leg showed no cysts and was normal (Doc. 9-1, p. 385/692).  A CT scan of her sinuses was normal (Doc. 9-1, p. 386/692).  Breaux complained she could not sleep, and was diagnosed with dyspnea and anxiety (Doc. 9-1, p. 359/692).

In April 2010, Breaux's weighed 280 pounds and her blood pressure was 135/74 (Doc. 9-1, p. 358/ 692).  A CT of her abdomen and pelvis showed no urinary tract stones or acute process (Doc. 9-1, p. 383/692).  Breaux was prescribed Tranxene and Paxil (Doc. 99-1, p. 358/692).

In November 2010, Breaux went to the emergency room for an anxiety attack followed by an occipital headache (Doc. 9-1, pp. 351-56/692).  Breaux weighed 292 pounds and her blood pressure was 125/85 (Doc. 9-1, p. 351/692).

In January 2011, Breaux weighed 308.5 pounds, her blood pressure was 130/70, and she was diagnosed with low blood pressure and anxiety (Doc. 9-1, p. 350/692).

Dr. Dale Bernauer treated Breaux in December 2012 and in 2013. In December 2012, Dr. Bernauer noted that Breaux's back showed decreased range of motion, positive straight leg raising positive, and strong dorsiflexors, extensor halluces lungus, plantar flexors, hamstrings, and quadriceps  (Doc. 9-1, p. 483/692). Breaux also had normal x-rays, a negative squeeze test, and a negative peroneal nerve sign (Doc. 9-1, p. 483/692).

After a fall in January 2013, x-rays of Breaux's right shoulder were normal (Doc. 9-1, p. 540/692), and her cervical spine showed reversal of the cervical lordosis (Doc. 9-1, p. 541/692). A CT scan of her cervical spine showed reversal of the normal cervical lordotic curvature (Doc. 9-1, p. 542/692). An MRI of Breaux's lumbar spine in January 2013 showed disc bulging and facet arthropathy at L4-5 and L5-S1 (Doc. 9-1, pp. 395, 468/692). There were no changes since MRIs in 2005 and 2010 (Doc. 9-1, p. 396, 398-99, 402, 468/692). An MRI of her left foot showed mild soft-tissue edema and swelling involving the subcutaneous tissues of the dorsal surface of the foot, but no evidence for a ligament or tendon tear, and no evidence for underlying bony pathology (Doc. 9-1, p. 469/692).

In January 2013, Dr. Bernauer found Breaux's range of motion was decreased, her triceps were strong, and her biceps were strong (Doc. 9-1, p. 477/692).

Breaux was evaluated in an emergency room in February 2013 for neck strain/sprain and cervical radiculopathy which occurred when she fell in January (Doc. 9-1, p. 666-67/692). According to Breaux, another doctor had told her she had a fractured bone in her neck that was overlapping another bone, and she needed an

MRI (Doc. 9-1, p. 667-68/692).  However, that medical record showed a diagnosis of cervical strain (Doc. 9-1, p. 6/692).

In March 2013, Breaux complained of neck and right arm pain (Doc. 9-1, p. 465/692), and in April she complained of pain in her neck, right arm, lower back, and right leg (Doc. 9-1, p. 463/692).

In May 2013, Breaux had an MRI of her cervical spine due to her complaints of neck pain radiating into both shoulders and arms (Doc. 9-1, p. 394/692).  There were minimal disc bulges along the cervical spine with a very shallow, broad disc herniation at C5-6, with a slightly narrow spinal canal and very slightly flattened ventral surface of the cord at C5-6 (Doc. 9-1, p. 394/692).  There were no changes since an MRI in October 2005 (Doc. 9-1, p. 400/692).

EMG nerve conduction studies in May 2013 "suggested the presence of sensory peripheral neuropathy in the lower extremities" and showed very minimal and chronic electromyographic changes along L4-5 and L5-S1 bilaterally (Doc. 9-1, pp. 403-05/692).  EMG studies of Breaux's upper extremities indicated moderately-severe bilateral carpal tunnel syndrome (Doc. 9-1, pp. 407, 462/692) and sensory peripheral neuropathy in the lower extremities (Doc. 9-1, p. 449/692).

Dr. Bernauer found Breaux has carpal tunnel syndrome and minimal disc bulging at C5-C6 with disc osteophyte complex (Doc. 9-1, p. 455/692).  Dr. Bernauer did not think any surgery was necessary, but stated she probably needed a carpal tunnel release (Doc. 9-1, p. 455/692).  In June 2013, Dr. Bernauer noted Breaux was still complaining of pain, and put her in braces for carpal tunnel (Doc. 9-1, p. 451/692).

In August 2013, Breaux was evaluated by Dr. Noorali Jiwani for leg pain possibly due to neuropathy (Doc. 9-1, p. 411/692).  Breaux weighed 322.25 pounds and her blood pressure was 122/90 (Doc. 9-1, p. 412/692).  Dr. Jiwani diagnosed morbid obesity for which he prescribed diet and exercise, chronic lumbar back pain for which he prescribed Ibuprofen, Naprelan, and Baclofen, and "FH diabetes" for which he prescribed diet and exercise (Doc. 9-1, pp. 413-414/962).  Two weeks later, Breaux weighed 325 pounds, her blood pressure was 124/86, and she complained of sharp pain in her back and legs (Doc. 9-1, pp. 419-20/692).  At that time, Dr. Jiwani diagnosed morbid obesity and chronic back pain, and prescribed diet, exercise, and Zanaflex (Doc. 9-1, p. 420/692).

In August and September 2013, Dr. Bernauer found Breaux had neuropathy and chronic changes at L4-L5 and L5-S1, and was still complaining of pain with no improvement (Doc. 9-1, pp. 443, 445/692).

Also in September 2013, an ER doctor evaluated Breaux for complaints of a seizure during her sleep, instructed her not to drive or operate machinery, and told her to follow up with a neurologist (Doc. 9-1, pp. 527, 532-37/92).  A CT exam of her brain showed no evidence of acute intracranial process (Doc. 9-1, p. 538/692).

In October 2013, Dr. Bernauer ordered cervical traction for Breaux (Doc. 9-1, p.441 /692).  Breaux's pain was not improved in November and December 2013 (Doc. 9-1, pp. 437, 439/692).

In February 2014, Breaux had a consultative evaluation with Dr. Patrick Mahaney (Doc. 9-1, p. 505/692).  Breaux reported low back pain radiating into her

hips and legs and some associated bilateral foot burning (Doc. 9-1, p. 505/692). Breaux's back bothers her more than her legs, her legs bother her when she sits too long or is trying to sleep, and her back is worse with activity and walking (Doc. 9-1, p. 505/692). Breaux also complained of axial neck pain radiating intermittently into her right arm, and left whole hand numbness with activity that bothers her at night and when she wakes (Doc. 9-1, p. 505/692). Breaux said she has neuropathy, a learning disability (trouble spelling and recalling learned information), and she took special education classes in high school, for which she received a certificate at graduation (Doc. 9-1, p. 505/692). Breaux also reported headaches, low back pain, knee pain, shoulder pain, neck pain, mood changes, and depression (Doc. 9-1, p. 507/692). Breaux's BP was 130/72 and she weighed 319 pounds (Doc. 9-1, p. 506/692).

Dr. Mahaney found Breaux had no muscle asymmetry, atrophy, or involuntary movements, her gait and station were normal, and she could rise from a sitting position without assistance, stand on tiptoes and heels, tandem walk, and bend and squat without difficulty (Doc. 9-1, p. 506/692). Breaux had 5/5 grip strength with adequate fine motor skills, dexterity, and ability to grasp objects bilaterally, and good tone with 5/5 strength bilaterally in all muscle groups (Doc. 9-1, pp. 506-07/692).

Dr. Mahaney diagnosed bilateral sacroiliac joint dysfunction, bilateral carpal tunnel syndrome, peripheral neuropathy-sensory, chronic neck pain, and obesity (Doc. 9-1, p. 507/692). Dr. Mahaney found Breaux can sit, walk, and/or stand for a full workday, lift/carry objects without limitations, hold a conversation, respond

appropriately to questions, and carry out or remember instructions (Doc. 9-1, p. 507/692).

In March 2014, Dr. Anthony Scardino made a residual functional capacity assessment of Breaux from a review of her medical records, as of the date Beaux was last insured for DIB, December 31, 2011 (Doc. 9-1, pp. 143-44/692). Dr. Scardino found Breaux can occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/work about six hours in an eight hour day, sit about six hours in an eight hour day, and do unlimited pushing and pulling with the lift/carry limitations (Doc. 9-1, p. 143-44/692). Breaux has postural limitations, can climb ramps/stairs frequently, can climb ladders/ropes/scaffolds occasionally, and is unlimited in balancing, stooping, kneeling, crouching, and crawling (Doc. 9-1, p. 144/692). Dr. Scardino recommended that Breaux do light work (Doc. 9-1, p. 145/692).

In March 2014, Lynette Causey, Ph.D. completed a psychiatric review technique form from a review of Breaux's mental health records (Doc. 9-1, p. 155/692). Causey found Breaux had: (1) mild restrictions of activities of daily living; (2) mild difficulties maintaining social functioning; (3) mild difficulties maintaining concentration, persistence, or pace; and (4) no repeated episodes of decompensation of extended duration (Doc. 9-1, p. 155-56/692). Causey further found Breaux: (1) is unable to hold onto things for long; (2) neuropathy causes pain and numbness in her legs; (3) is unable to stand or sit for long periods; (4) is very depressed; (5) can walk for 30 minutes; (6) is unable to follow instructions or read well; and (7) is unable to handle stress or changes in routine (Doc. 9-1, p. 157/692).

In June 2014, Dr. Bernauer made a residual functional capacity assessment of Breaux (Doc. 9-1, p. 520/692).  Dr. Bernauer stated he had treated Breaux monthly since 2005, and diagnosed her with a herniated nuclear pulposis-lumbar spine, herniated nuclear pulposis-cervical spine, and neck strain, which cause neck pain, back pain, bilateral arm pain, bilateral leg pain, right knee strain, and carpal tunnel syndrome (Doc. 9-1, p. 520/692).  Breaux's symptoms frequently interfere with the attention and concentration needed to perform simple work-related tasks (Doc. 9-1, p. 5205/692).  Breaux's medication causes drowsiness that may impact her capacity for work (Doc. 9-1, p. 520/692).

Breaux needs to recline or lie down in excess of the typical workday 15 minute morning and afternoon breaks, and 30-60 minute lunch break (Doc. 9-1, p. 520/692).  Breaux also needs to take unscheduled 10 minute breaks during the day (Doc. 9-1, p. 520/692).  Dr. Bernauer stated that Breaux can walk one city block without rest or significant pain, sit 30 minutes at a time and up to four hours in an eight hour day, and stand/walk 10 minutes at a time and up to 2 hours in an eight hour day (Doc. 9-1, p. 520/692).  Breaux can lift/carry less than 10 pounds frequently and 10 pounds occasionally; grasp, turn, or twist objects up to 10 % of the work day; do fine manipulation up to 10 % of the work day; and reach with both arms up to 20 % of the work day (Doc. 9-1, p. 521/692).  Dr. Bernauer said Breaux is likely to miss more than four days per month from work, and is not physically capable of working an eight hour day, five days per week on a sustained basis (Doc. 9-1, p. 521/692).

Breaux began participating in a weight management program with Dr. Lisa Vaughn, D.O. (obstetrics and gynecology) in April 2014 (Doc. 9-1, p. 613/692). At that time, Breaux weighed 330.13 pounds, her blood pressure was 115/75, and she complained of not having enough energy to exercise (Doc. 9-1, p. 613/692). Breaux was diagnosed with abnormal weight gain and morbid obesity, and prescribed Adipex-P and B-12 injections (Doc. 9-1, p. 614-15/692). In August 2014, Breaux weighed 299.5 pounds, her blood pressure was 124.81, and her BMI was 53.25% (Doc. 9-1, p. 603/692). In June 2014, Breaux weighed 304.5 pounds, her blood pressure was 120/94, and her medications were continued (Doc. 9-1, p. 611-12/692). In November 2014, Breaux had lost 15 pounds since her last visit, and weighed 312 pounds (Doc. 9-1, pp. 571-72/962).

In October 2014, a complete retroperitoneal ultrasound, conducted due to Breaux's complaints of abdominal pain, showed her kidneys and bladder were normal (Doc. 9-1, pp. 526, 588/692). Dr. Felicia Joseph noted Breaux's complaints of kidney pain, anxiety, and depression (Doc. 9-1, p. 590/692). Breaux weighed 301 pounds and her blood pressure was 126/86 (Doc. 9-1, p. 590/692). Dr. Joseph diagnosed anxiety, urinary system disorder, morbid obesity, and GERD (gastroesophageal reflux disease) (Doc. 9-1, p. 591/692). Dr. Joseph prescribed Vistaril, weight loss diet, exercise, limited salt intake, and continued participation in weight management with Dr. Vaughn (Doc. 9-1, p. 591/692).

Dr. Bernauer treated Breaux in April, May, June, July, September and October 2014 (Doc. 9-1, pp. 587, 597, 606-07, 609, 625, 633, 635, 637, 639, 641/692). Breaux

complained of neck pain, back pain, bilateral arm pain, bilateral leg pain, and right knee pain (Doc. 9-1, p. 609/692). X-rays and an MRI of her right knee were negative (Doc. 9-1, pp. 607-09, 643-44/692). Breaux had a decreased range of motion in her back, positive straight leg raising, and strong dorsiflexors, extensor halluces lungus, plantar flexors, triceps, and biceps (Doc. 9-1, p. 587/692). Dr. Bernauer prescribed Norco and Robaxin (Doc. 9-1, p. 587/692).

Also in October 2014, Breaux began behavioral health care with Dr. Horatio Millin, a psychiatrist (Doc. 9-1, p. 582/692). Dr. Millin found Breaux was dysphoric and anxious, her insight was impaired, she had borderline intellect, and she was a poor historian (Doc. 9-1, p. 582/692). Dr. Millin diagnosed: Axis I-major depressive disorder, generalized anxiety disorder, and panic disorder; Axis II-borderline intellect; Axis 3-obesity and BTL; Axis 4-psychosocial issues; and Axis 5-GAF of 55[2]

---

[2] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning. See Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM- IV-TR").

The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system. The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. See Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR"). GAF is a standard measurement of an individual's overall functioning level. The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social, and occupational functioning, on a hypothetical continuum of mental health-illness. The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year. See DSM-IV-TR at 32-34. The GAF scale goes from 0-100. A GAF score of 51-60 means moderate symptoms OR moderate difficulty in social, occupational, or school functioning, and a score of 41-50 means serious symptoms OR serious impairment with social, occupational, or school functioning. See DSM-IV-TR, at 34; see also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

In the more recent fifth edition DSM-V, a non-axial system of evaluation was adopted, and GAF scoring was discontinued. See Diagnostic and Statistical Manual of Mental Disorders, p. 16 (5th ed. 2013).

(Doc. 9-1, p. 583/692).  He prescribed Seroquel, Celexa, and klonopin (Doc. 9-1, p. 583/692).  Breaux told Dr. Millin she was not sleeping through the night and was having "focusing" problems (Doc. 9-1, pp. 578, 5580/692).  At that time, Breaux was alert and cooperative, had normal mood and affect, and normal attention span and concentration.  Dr. Millin added Adderall to her medications (Doc. 9-1, p. 580/692).

In November 2014, Dr. Millin found Breaux's major depressive disorder and generalized anxiety disorder were both improved with her medications (Doc. 9-1, pp. 576-577/692).  Dr. Millin saw Breaux in December 2014 for medication and therapy for anxiety disorder and panic disorder (Doc. 9-1, p. 547/692).  Breaux was taking Seroquel, Celexa, klonopin, and Adderall (Doc. 9-1, p. 547, 567/692).  Dr. Millin diagnosed: Axis I – major depressive disorder, ADD, "FAD", and panic disorder; Axis II – borderline intellect; Axis III – obesity, "BTL"; Axis IV - psychosocial issues; and Axis V – GAF of 55 (Doc. 9-1, pp. 547, /692).   In January 2015, Dr. Millin diagnosed major depressive disorder, single episode, moderate; and attention deficit disorder, adult (Doc. 9-1, pp. 549, 567/692).

In December 2014 and January and February 2015, Dr. Bernauer examined Breaux, found decreased range of motion in her neck, strong biceps and triceps, decreased range of motion in her back, and positive straight leg raising, and prescribed Norco, Robaxin, and Neurontin (Doc. 9-1, pp. 564, 628, 630, 651/692).

Breaux also had a consultative exam with Dr. Thomas Alderson, a urologist, in December 2014 due to her complaints of back pain during and after voiding (Doc. 9-1, p. 569/692).  Dr. Alderson noted Breaux's previous bladder surgery at age 13 (Doc.

13

9-1, p. 569/962).  Breaux's lab work and ultrasound were normal (Doc. 9-1, p. 570/962).

Dr. Alderson was not able to explain Breaux's pain and sent her for further testing

(Doc. 9-1, p. 570/692).

In January 2015, Breaux reported to Dr. Millin that she was doing much better

on her medications (Doc. 9-1, p. 658-61/692).   In February 2015, Breaux again

reported to Dr. Millin that she was doing much better, the Seroquel was discontinued,

and Restoril was added (Doc. 9-1, p. 654-57/692).

Dr. Millin filled out a mental capacity assessment of Breaux in February 2015

(Doc. 9-1, p. 646/692).  Dr. Millin found Breaux has: (1) marked limitations in all

areas of her understanding and memory; (2) marked limitations in seven areas,

extreme limitations in two areas, and a moderate limitation in one area of her

sustained concentration and persistence; (3) marked limitations in two areas,

extreme limitations in two areas, and a moderate limitation in one area of her social

interaction; and (5) marked limitations in one area and extreme limitations in three

areas of adaptation (Doc. 9-1, p. 646-48/692).  However, Dr. Millin found Breaux has

the ability to manage financial benefits (Doc. 9-1, p. 648/692).  Dr. Millin further

stated that Breaux has had the outlined limitations and restrictions since he began

treating her on October 14, 2014 (Doc. 9-1, p. 649/692).

In March 2015, Breaux was evaluated in an emergency room due to slurred

speech, unkempt appearance, slowed motor activity, and auditory and visual

hallucinations (Doc. 9-1, p. 674/692).  Breaux said she had stopped taking Seroquel,

without advising her doctor, because "people were telling her she was sleeping too

long" (Doc. 9-1, p. 674/692). First, Breaux complained of alien bugs that were there to get her and hurt her, and yelled to have the lights turned off, so the lights were turned off and she calmed down (Doc. 9-1, p. 674/692). Second, Breaux saw bugs all over and asked for blankets to keep the bugs off her (Doc. 9-1, p. 674/692). Next, Breaux said she felt like she was going to pass out, she was breathing too fast, needed a cold rag for her head, her back hurt, and her chest hurt (Doc. 9-1, p. 675/692). Breaux was diagnosed with paranoid delusions and auditory hallucinations, as well as a possible seizure, and she was admitted for a psychiatric evaluation (Doc. 9-1, p. 681, 686/692). An EEG was normal, both awake and asleep (Doc. 9-1, p. 683/692).

In January 2016, Breaux was admitted to the hospital for an intentional suicide attempt by drug overdose with klonopin (Doc. 9-1, p. 15/692). Breaux was treated by Dr. Hung H. Nguyen and Dr. David Buttross (a psychiatrist), and diagnosed with obesity, depression, anxiety disorder, back pain, schizoaffective disorder, obstructive sleep apnea, hypertension, and a history of gastric ulcers (Doc. 9-1, p. 15/692). Breaux was discharged to inpatient psychiatry, and prescribed Xanax and hydrocodone with acetaminophen (Doc. 9-1, p. 15/692). Breaux was 35 years old at that time (Doc. 9-1, p. 17/692). Breaux explained that, recently, her husband had left her, her brother was killed (Doc. 9-1, p. 28/692), and her uncle had shot and killed himself (Doc. 9-1, p. 15/692).

### C.    Administrative Hearing

At the March 4, 2015 administrative hearing, Breaux testified that she was 34 years old, right-handed, 5'3" tall, weighed over 300 pounds, and lived with her

husband and two daughters (nine and ten years old) (Doc. 9-1, p. 69/692). Breaux's husband was unemployed at that time and Breaux did not have any income, but her nine-year-old daughter received SSI (Doc. 9-1, pp. 69-70/692). Breaux said she believes her medications have caused her to gain weight, so she takes a medication for her weight and has someone advising her about her weight (Doc. 9-1, pp. 79-80/692).

Breaux testified that she drives an automatic transmission car (Doc. 9-1, p. 70/692). Breaux completed high school in special education classes and received a certificate of achievement (Doc. 9-1, p. 71/692). Breaux can write but she cannot read very well (Doc. 9-1, p. 71/692). Breaux wanted to attend beauty school but was not able to because she could not pass the tests (Doc. 9-1, p. 71/692), it is too much standing, and her hand becomes numb (Doc. 9-1, p. 92/692). Breaux also said she cannot calculate change without a calculator (Doc. 9-1, p. 72/692).

Breaux testified that she has worked at a daycare and done some housekeeping and cooking, but cannot do it any longer because of her back pain (Doc. 9-1, p. 73/692). Breaux has applied for jobs answering phones, but was not hired because she cannot read very well (Doc. 9-1, pp. 73-74/692). Breaux has not applied for a job in several years (Doc. 9-1, p. 74/692).

Breaux testified she can lift a 12-pack of Coke sometimes, but sometimes her hand gives out (Doc. 9-1, p. 74/692). Breaux thought she would have carpal tunnel surgery on both hands soon because Dr. Bernauer had talked about referring her to a surgeon (Doc. 9-1, pp. 74-75/692). Dr. Bernauer gave Breaux exercises to do, but

she said she cannot lay on the floor due to pain, and her legs get numb if she moves them around a lot (Doc. 9-1, p. 79/692).  Breaux testified that chiropractors will not touch her because she has two vertebrae in her neck that are "off" (Doc. 9-1, p. 98/692). Breaux has had epidural injections, but the last one was four or five years ago, and they did not work (Doc. 9-1, p. 99/692).

Breaux testified that she drives her car about three times per week, usually to her doctor's appointments, her cousin's home, or her sister's home (Doc. 9-1, p. 75/692).  Sometimes her cousin visits her (Doc. 9-1, p. 79/692).  Breaux grocery shops and can carry light grocery bags, but it is a short trip if she is hurting (Doc. 9-1, pp. 75, 98/692).  Breaux does some housework during the day, but it may not be completed (Doc. 9-1, p. 78/692).  Breaux's husband does most of the cooking (Doc. 9-1, p. 90/692). When Breaux cooks, it takes her a few hours to complete a meal because of her pain and numbness (Doc. 9-1, p. 90/692).

Breaux's hands become numb when she drives (Doc. 9-1, p. 84/692).  Breaux testified that she has to drive because her husband does not have a driver's license (Doc. 9-1, p. 84/692).  It is about a 30 minute drive to Breaux's doctor appointments (Doc. 9-1, p. 84/692).   Breaux does not hurt until she gets out of the car and starts walking (Doc. 9-1, p. 85/692).  Sitting is not a problem, but getting up and down or standing a long time hurts (Doc. 9-1, p. 85/692).  The pain is in Breaux's back, hand, neck, and legs, but mostly in her back and legs (Doc. 9-1, p. 85/692).  The neck pain is not constant (Doc. 9-1, p. 86/692).  Numbness in her legs makes it difficult for Breaux to walk sometimes (Doc. 9-1, p. 86/692).

17

Breaux testified that she has never smoked cigarettes and does not drink (Doc. 9-1, pp. 75-76/692). Breaux goes to church sometimes, if she is able to (Doc. 9-1, p. 76/692). Breaux tries to help her children with homework, but she becomes anxious if she cannot understand it (Doc. 9-1, p. 76/692). Breaux attends school conferences and her daughters' teachers read the reports to her (Doc. 9-1, p. 77-78/692). During the day, Breaux watches TV sometimes, and cleans her house (Doc. 9-1, p. 103/692).

Breaux testified that, when she is anxious, she may become angry, such as when she cannot read something (Doc. 9-1, p. 78/692). It bothers Breaux a lot when she cannot read something (Doc. 9-1, pp. 80-81/692). Other people, usually family members, help Breaux fill out forms (Doc. 9-1, pp. 105-06/692). Breaux pays the household bills by paying them in person, either in cash or with a debit card (Doc. 9-1, p. 107/692).

Breaux sees Dr. Millan once a month for her anxiety (Doc. 9-1, p. 76/692). Dr. Millan recently wanted to put Breaux in a hospital but she refused to go because she has to take care of her children (Doc. 9-1, p. 76/692). Dr. Millan wanted her to go to the hospital because she gets aggravated and wants to "give up on life" (Doc. 9-1, p. 104/692). Sometimes when Breaux is depressed or hurting a lot, she does not go anywhere for a week or two (Doc. 9-1, pp. 86-87/692).

Breaux has good days and bad days (Doc. 9-1, p. 87/692). On a bad day, the pain is constant and worse (Doc. 9-1, p. 87/692). The pain increases when she tries to do anything, such as chores (Doc. 9-1, p. 88/692). On days when Breaux cannot

move her neck at all, Dr. Bernauer may prescribe her a steroid (Doc. 9-1, p. 88/692). Breaux takes more breaks from her chores on bad days (Doc. 9-1, p. 88/692).

Breaux testified that she has problems with her hands every day, mostly the right hand (Doc. 9-1, pp. 88-89/692). All of her fingers become numb, and they get sores often because she cannot feel anything (Doc. 9-1, p. 89/692). Dr. Bernauer told Breaux to keep lotion on her hands (Doc. 9-1, p. 89/692). Usually, Breaux has pain in her wrists, her fingers stay numb, and her wrists hurt more if she tries to do anything (Doc. 9-1, p. 90/692). Breaux drops things when her hands are numb (Doc. 9-1, p. 91/692). Breaux usually wears a brace on her right hand, but she cannot drive (steer) with the brace on (Doc. 9-1, p. 92/692).

Breaux testified that she can stand 10 or 15 minutes without a break, then she has to sit a few minutes before she gets up again (Doc. 9-1, p. 93/692). It takes Breaux all day to clean her house because she is constantly up and down (Doc. 9-1, p. 94/692). When she mops, Breaux had numbness in her hands and her back gives out sometimes (Doc. 9-1, p. 94/692). Breaux can also wash a few dishes or use the dishwasher (Doc. 9-1, p. 95/692). Breaux has difficulty standing at the sink and has to lean against it (Doc. 9-1, p. 95/692). When the pain bothers Breaux too much, she becomes aggravated and frustrated (Doc. 9-1, p. 95/692). Breaux can sit for 20 to 30 minutes, then has to stand up, then sits down again when that becomes uncomfortable (Doc. 9-1, p. 96/692). Breaux said she can lift a gallon of milk sometimes, but sometimes she drops it (Doc. 9-1, p. 97/692). Breaux often drops things when her hands become numb (Doc. 9-1, p. 97/692).

Breaux testified that her medications affect her memory, particularly the medicine she takes to help her sleep (Doc. 9-1, p. 100/692).  Dr. Millan changed her medicine, but the new one does not help her sleep (Doc. 9-1, p. 101/692).  Breaux takes her medication daily except for her pain medication, which she only takes if she starts to hurt badly (Doc. 9-1, p. 102/692).  Breaux testified she also has trouble concentrating because she gets aggravated (Doc. 9-1, p. 104/692).

At the end of the hearing, the ALJ agreed to hold the record open two weeks for the Literacy Counsel's assessment of Breaux reading level (second grade) and, if necessary, to have Breaux take an IQ test (Doc. 9-1, p. 108/692).

D.    **The ALJ's findings and conclusions.**

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Breaux (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing the claimant is capable of performing work in the national economy.  See Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Breaux has not engaged in substantial gainful activity since April 29, 2011, and her disability insured status expired after December 31, 2011 (Doc. 9-1, p. 49/692).  The ALJ found Breaux has severe impairments of degenerative changes of the cervical and lumbar spine, neuropathy, obesity, and carpal tunnel syndrome (Doc. 9-1, p. 49/692), but she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc. 9-1, p. 52/692).  The ALJ stated it was unnecessary to make any findings with regard to Breaux's ability to do past relevant work (Doc. 9-1, p. 58/692).

The ALJ further found that Breaux has the residual functional capacity to perform light work, except that she is limited to unskilled work that requires no more than frequent climbing of ramps and stairs, and occasional climbing of ropes, ladders, and scaffolds (Doc. 9-1, p. 52/692).  The ALJ found that Breaux was a younger individual with a marginal education, and transferability of job skills was not relevant (Doc. 9-1, p. 108/692).  The ALJ further found the limitation to unskilled work does not significantly erode the occupational base for light work, which primarily involves dealing with objects rather than people or data (Doc. 9-1, p. 59/692).  The ALJ found that Rule 202.17 of the Medical-Vocational Guidelines, 20

21

C.F.R. Part. 404, Subpart P, Appendix 2, directs a conclusion of "not disabled" (Doc. 9-1, p. 58/692).

The ALJ concluded that Breaux was not under a disability from April 29, 2011 through the date of his decision on May 1, 2015 (Doc. 9-1, p. 59/692).

## II.    Law and Analysis

### A.    Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for

the Commissioner and the ALJ, rather than the court. See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. See Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

### B. The ALJ findings as to Breaux's mental impairments are supported by substantial evidence.

Breaux contends the ALJ failed to properly assess her mental impairments, arguing the Medical Vocational Guidelines are inapplicable when there is a mental impairment. Breaux also argues the ALJ's use of the Medical-Vocational Guidelines is inappropriate in light of Breaux's mental impairment.

A claimant's impairments may cause physical or mental limitations that affect what she can do in a work setting. Residual functional capacity is a medical assessment, based on all of the relevant evidence, of the work a claimant can perform despite her limitations. See 20 C.F.R. §416.945. The burden of proof in a disability case is on the claimant to show that she is unable to perform her usual line of work. Once that fact is established, the burden shifts to the Commissioner to show that the claimant is able to perform some other kind of substantial work available in the national economy. See Herron v. Bowen, 788 F. 2d 1127, 1131 (5th Cir. 1986); see also, Babineaux v. Heckler, 743 F.2d 1065, 1067 (5th Cir. 1984). The Commissioner

has the burden to establish a claimant's residual functional capacity and that that she can perform work in the national or regional economy.  See Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983); Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995).

Although the ALJ did not find Breaux can no longer do her past work, he proceeded to show that Breaux can perform other work in the national economy.  See Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).  The law provides the Commissioner can meet that burden if she can prove that Breaux's residual functional capacity, age, education and previous work experience match those set out in any "Rule" of the Medical-Vocational Guidelines, found in 20 C.F.R. Pt. 404, Subpt. P, App. 2, which directs a conclusion the claimant is not disabled.  Sec. 200.00(a) of Appendix 2 states:

> Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled.

The U.S. Supreme Court has upheld the use of the Guidelines by the Commissioner in lieu of calling a vocational expert to testify.  See Heckler v. Campbell, 461 U.S. 458 (1983); see also Harrell v. Bowen, 862 F.2d 471, 478 (5th Cir. 1988).

In the case at bar, the ALJ found that Breaux can perform substantially the full range of light work and that Rule 202.17 directs a conclusion of not disabled. "Light work" is defined in 20 C.F.R. § 404.1567(b) and § 416.967(c) as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

24

> To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

The capability for light work represents the capability for substantial numbers of unskilled jobs, which in turn represents substantial vocational scope for younger individuals, even if illiterate.  See 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.00(g). Literacy and ability to communicate in English are the least significant in unskilled, light work than for any other occupational base.  See 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.00(g).

Breaux argues the ALJ failed to consider her social anxiety disorder.  However, he specifically considered it in his opinion (Doc. 9-1, p. 59 /692), and noted that 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.00(g) provides that the primary work functions in the bulk of unskilled work relate to working with things, rather than data or people.

Breaux had the burden of proving the limited natures of her education and intelligence.  There is no evidence in the record concerning those factors except Breaux's own testimony and statements to her doctors, and the bare findings of mental health professionals that she has "borderline intelligence."  There are no intelligence-measuring tests, school records, or developmental history in the record to prove Breaux's intelligence and education.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(H)(2)(d).  However, the ALJ accepted Breaux's statement that she attended special education classes in high school and found she has a marginal education.[3]

---

[3] "Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs.  We general consider that formal schooling at a 6th grade level of less is a marginal education."  20 C.F.R. § 404.1564(b)(2).

Breaux further argues the ALJ erred in rejecting Dr. Millin's opinion as to her mental functional limitations.  Dr. Millin found she has "marked" and "extreme" mental functional limitations in almost every areas of mental functioning.  "Marked limitation" means "[y]our functioning in this area independently, appropriately, effectively and on a sustained basis is seriously limited."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E)(4)(d).  "Extreme limitation" means "[y]ou are not able to function in this area independently, appropriately, effectively and on a sustained basis."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E)(4)(d).   There are no results from standardized tests of mental functioning and intelligence, no school records, and no third party testimony in the record to support these findings.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(H)(3)(b).

It appears from Breaux's testimony that her limitations are not marked or extreme.  She lives with her immediate family, cleans her home, does chores, drives, goes to her doctor appointments by herself, grocery shops, visits her extended family, takes care of her personal hygiene, and takes care of her daughters.  Therefore, the ALJ did not err in giving less weight to Dr. Millin's opinion that Breaux has marked and extreme limitations in nearly every area of mental functioning.

 Breaux contends she requested IQ testing.  However, Breaux was given time to get an IQ test and failed to do so.  The ALJ has the discretion to order a consultative examination.  An examination at government expense is not required unless the record establishes that such an examination is necessary to enable the ALJ to make the disability decision.  See Anderson v. Bowen, 887 F.2d 630, 634 (5th Cir. 1989); see

also Brock v. Chater, 84 F.3d 726 (5th Cir. 1996); Wren v. Sullivan, 925 F.2d 123, 127 (5th Cir. 1991); Haywood v. Sullivan, 888 F.2d 1463, 1472 (5th Cir. 1989). As stated above, an IQ test was not necessary for the ALJ to determine whether Breaux is disabled.

Moreover, it is noted this appears to be Breaux's fourth social security application (Doc. 9-1, p. 118/692). Issues as to her ability to read and write apparently arose in the proceedings on the third application (Doc. 9-1, pp. 107, 122/692), yet Breaux did not have her IQ tested then or now. Breaux failed to carry her burden of proving her intelligence is so limited that she is unable to perform unskilled light work.

Finally, although mental retardation is a non-exertional impairment, below-average intelligence alone does not constitute a non-exertional impairment. Selders v. Sullivan, 914 F.2d 614, 619 (5th Cir.1990) (citing Johnson v. Sullivan, 894 F.2d 683, 686 (5th Cir.1990)). Therefore, Breaux's "borderline intellect" did not prevent the ALJ from relying on the Guidelines. See Selders, 914 F.2d at 619 (the borderline range of intelligence js not a non-exertional impairment that renders a claimant entirely unable to perform light or sedentary work).

The ALJ's finding that Breaux is not disabled because she can do unskilled, light work is supported by substantial evidence, and the ALJ did err in relying on the Medical-Vocational Guidelines.

### C. The ALJ did not err in relying on the opinion of a consultative physician to find Breaux has the residual functional capacity to do light work.

Next, Breaux contends the ALJ erred in finding she is capable of performing a reduced range of light work. Breaux argues the ALJ erred in giving more weight to the opinions of non-examining consultant Dr. Scardino and examining consultant Dr. Mahaney, than to her treating physician, Dr. Bernauer.

Sections 404.1527(d) and 416.927(d) of 20 C.F.R. state:

(d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
(1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

See also Social Security Ruling 96-2p.

Ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability. See Myers v. Apfel, 238 F.3d 617, 621 (5th Cir.2001) (citing Greenspan v. Shalala, 38 F.3d at 237); see also See Giles v. Astrue, 433 Fed. Appx. 241, 246–47 (5th Cir .2011) (citing Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000); Loza, 219 F.3d at 395. However, these opinions are not conclusive, and the ALJ must decide the claimant's status. See Myers, 238 F.3d at 621 (citing Greenspan, 38 F.3d at 237). Accordingly, when good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony. The good cause exceptions we have recognized include

disregarding statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence.  See *id.; see also* Leggett v. Chater, 67 F.3d 558, 566 (5th Cir. 1995).

If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the Commissioner] will give it controlling weight."  See Giles, 433 Fed. Appx. at 246-47 (citing 20 C.F.R. § 404.1527(d)(2)).  Likewise, when a treating physician has reasonable knowledge of the impairment, his opinion is given more weight than an opinion from a non-treating physician.  See *id.*  In contrast, the Commissioner may give less weight to a treating physician's opinion about a condition outside his area of expertise.  See *id.*  Treating physicians' opinions also receive greater weight "[w]hen the treating source has seen the claimant a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment."  See *id.*  The weight given to opinions from nonexamining physicians depends on "the degree to which they provide supporting explanations for their opinions."  See *id.*

Dr. Mahaney found Breaux can sit, walk, and/or stand for a full workday, lift/carry objects without limitations, hold a conversation, respond appropriately to questions, and carry out or remember instructions (Doc. 9-1, p. 507/692).  Dr. Scardino found Breaux can occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, sand/work about six hours in an eight hour day, sit about six hours in an eight hour day, and do unlimited pushing and pulling with the lift/carry limitations (Doc. 9-1, p.

143-44/692).  Breaux has postural limitations, can climb ramps/stairs frequently, climb ladders/ropes, scaffold occasionally, and is unlimited in balancing, stooping, kneeling, crouching, and crawling (Doc. 9-1, p. 144/692).

The ALJ gave less weight to Dr. Mahaney's opinion because "Dr. Mahaney did not have access to the claimant's complete medical file, which does show some minimal objective limitations" (Doc. 9-1, p. 56/692).

Dr. Scardino found Breaux can occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/work about six hours in an eight hour day, sit about six hours in an eight hour day, and do unlimited pushing and pulling with the lift/carry limitations (Doc. 9-1, p. 143-44/692).  Dr. Scardino also found Breaux has postural limitations, can limb ramps/stairs frequently, can climb ladders/ropes/scaffolds occasionally, and is unlimited in balancing, stooping, kneeling, crouching, and crawling (Doc. 9-1, p. 144/692).  The ALJ accepted Dr. Scardino's conclusions as supported by the record of evidence and consistent with subsequently received evidence (Doc. 9-1, p. 55/692).

Dr. Bernauer found: (1) Breaux's pain frequently interferes with the attention and concentration needed to perform simple work-related tasks (Doc. 9-1, p. 5205/692); (2) the medication side effect that may impact Breaux's capacity for work is drowsiness (Doc. 9-1, p. 520/692); (3) Breaux needs to recline or lie down in excess of the typical workday 15 minute morning and afternoon breaks and 30-60 minute lunch break (Doc. 9-1, p. 520/692); (4) Breaux also needs to take unscheduled 10 minute breaks during the day (Doc. 9-1, p. 520/692); (5) Breaux can walk one city

block without rest or significant pain, sit 30 minutes at a time and up to four hours in an eight hour day, and stand/walk 10 minutes at a time and up to two hours in an eight hour day (Doc. 9-1, p. 520/692); (6) Breaux can lift/carry less than 10 pounds frequently and 10 pounds occasionally; and (7) Breaux can grasp, turn or twist objects up to 10 % of the work day, do fine manipulation up to 10 % of the work day, and reach with both arms up to 20 % of the work day (Doc. 9-1, p. 521/692).  Dr. Bernauer said Breaux is likely to miss more than four days per month from work, and is not physically capable of working an eight hour day, five days per week on a sustained basis (Doc. 9-1, p. 521/692).

The ALJ correctly noted that, "[a]lthough Dr. Bernauer is a treating provider, as detailed above, his ongoing treatment records show nothing more than medication management with notation of spinal tenderness and positive straight leg raising but normal strength.  There is nothing to support his opining such extreme restriction, which are contradicted by outside treatment records, the findings during the consultative examination, as well the claimant's own reported abilities."  Doc. 9-1, p. 56/692.

Since the ALJ found that Dr. Bernauer's opinion was not well-supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with the other substantial evidence, his decision to give Dr. Bernauer's opinion little weight is supported by the record and his reasoning.

The ALJ did not err in giving less weight to the opinion of the treating physician in this case and in finding Breaux can perform light work.

31

D.    **The Appeals Council did not err in failing to consider Breaux's new evidence.**

Breaux contends the Appeals Council erred as a matter of law in failing to consider her new and material medical evidence.  Breaux is referring to the 2016 medical records.

The Appeals Council stated it "looked at the medical evidence from Christus St. Patrick Hospital dated January 18, 2015 to January 20, 2016.  The Administrative Law Judge decided your case through May 1, 2015.  This new information is about a later time.  Therefore, it does not affect the decision about whether you were disabled beginning on or before May 1, 2015."  (Doc. 9-1, p. 6/692).

If additional evidence is presented while the case is pending review by the Appeals Council, courts of appeals customarily review the record as a whole, including the new evidence, in order to determine whether the Commissioner's findings are still supported by substantial evidence.  See Higginbotham v. Barnhart, 163 Fed. Appx. 279, 281 (5th Cir. 2006).

The ALJ's decision concerned Breaux's condition from April 29, 2011 through the date of his decision in 2015.[4]  Breaux's new evidence concerns an event that occurred in 2016, her suicide attempt that was apparently motivated by her recent separation from her husband and the recent deaths of her brother and uncle. Therefore, the Appeals Council did not err in finding the 2016 medical records did not

---

[4] The subsequent deterioration of a claimant's previously non-disabling condition, after the date of the Commissioner's decision, may form the basis of a new claim.  See Johnson v. Heckler, 767 F.2d 180, 183 (5th Cir. 1985); see also Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994).

dilute the evidence supporting the ALJ's decision as to Breaux's ability to work as of May 1, 2015.

### III.  Conclusion

Based on the foregoing, IT IS RECOMMENDED that Breaux's social security appeal be DENIED AND DISMISSED with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this __19th__ day of December, 2017.

Joseph H.L. Perez-Montes
United States Magistrate Judge

33